Joseph F. Postnikoff
State Bar No. 16168320
Kevin G. Herd
State Bar No. 24027017
LAW OFFICES OF JOSEPH F. POSTNIKOFF, PLLC
77 Main Street
Fort Worth, Texas 76102
Telephone: 817.335.9400
Email: jpostnikoff@postnikofflaw.com
Email: kherd@postnikofflaw.com

COUNSEL FOR SHAWN K. BROWN, CHAPTER 7
TRUSTEE AND PLAINTIFF HEREIN

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SPECIALTY SELECT CARE CENTER | § | CASE NO.: 17-44248-elm-7 |
| OF SAN ANTONIO, LLC, | § | |
| | § | |
| Debtor. | § | |

_____

| | | |
|---|---|---|
| SHAWN K. BROWN, Chapter 7 | § | |
| Trustee for Specialty Select Care | § | |
| Center of San Antonio, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO.  20-04060-elm |
| | § | |
| LLOYD DOUGLAS, Individually, *et al*., | § | |
| | § | |
| | § | |
| Defendants. | § | |

## TRUSTEE'S SECOND AMENDED COMPLAINT

TO THE HONORABLE EDWARD L. MORRIS, UNITED STATES BANKRUPTCY JUDGE:

COMES NOW Shawn K. Brown, Chapter 7 Trustee ("Trustee" or "Plaintiff") in the

above styled and numbered chapter 7 bankruptcy proceeding and Plaintiff herein, and files this

Trustee's Second Amended Complaint (this "Complaint") against Lloyd Douglas, Individually, Lloyd Douglas Enterprises, L.C., a Texas limited liability company, Brownwood Care Center I, Ltd., a Texas limited partnership, D-5 Development, LLC, a Texas limited liability company, Sunflower Park Holdings, LP, a Texas limited partnership, Whispering Pines Healthcare, L.C., a Texas limited liability company, Mt. Pleasant Operators, LLC, a Texas limited liability company, Specialty Select Care Center, LLC, a Texas limited liability company, Graham Investors Group, LLC, a Texas limited liability company, Kemp Investor Holdings, LLC, a Texas limited liability company, Kerens Care Center, Inc., a Texas corporation, and River City Life Care, Inc., a Texas corporation (jointly, the "Defendants") Defendants herein, and in support thereof would respectfully show unto the Court as follows:

## I.      BANKRUPTCY

1.      On October 20, 2017 (the "Petition Date"), Specialty Select Care Center of San Antonio, LLC ("Debtor") filed a Voluntary Petition for Relief Under chapter 7 of the Bankruptcy Code commencing this case.  Shawn K. Brown was subsequently appointed and qualified to serve as Chapter 7 Trustee.

## II.      JURISDICTION AND VENUE

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (E) and (F). Venue is proper in this District pursuant to 28 U.S.C. §§1409.

## III.      PARTIES

3.      Plaintiff is the duly qualified and acting Trustee of the bankruptcy estate of the above-named Debtor.

4.      Defendant, Lloyd Douglas ("Douglas") is an individual who may be served with process at P.O. Box 1745 Aledo, Texas 76008 or wherever he may be found.

5.      Defendant, Lloyd Douglas Enterprises, L.C. ("Douglas Enterprises") is a Texas limited liability company and may be served with process pursuant to Federal Rule of Civil Procedure 4 and Federal Rule of Bankruptcy Procedure 7004 by and through its registered agent CT Corporation System 1999 Bryan St., Suite 900 Dallas, Texas 75201-3136.

6.      Defendant, Brownwood Care Center I. Ltd. ("Brownwood") is a Texas limited partnership and may be served with process pursuant to Federal Rule of Civil Procedure 4 and Federal Rule of Bankruptcy Procedure 7004 by and through its registered agent Lloyd Douglas 1415 Ballinger Street, Fort Worth, Texas 76102..

7.      Defendant, D-5 Development, LLC ("D-5") is a Texas limited liability company and may be served with process pursuant to Federal Rule of Civil Procedure 4 and Federal Rule of Bankruptcy Procedure 7004 by and through registered agent Lloyd Douglas 1415 Ballinger Street, Fort Worth, Texas 76102.

8.      Defendant, Sunflower Park Holdings, LP ("Sunflower") is a Texas limited partnership and may be served with process pursuant to Federal Rule of Civil Procedure 4 and Federal Rule of Bankruptcy Procedure 7004 by and through its registered agent Lloyd Douglas 1415 Ballinger Street, Fort Worth, Texas 76102.

9.      Defendant, Whispering Pines Healthcare, L.C. ("Whispering Pines") is a Texas limited liability company and may be served with process pursuant to Federal Rule of Civil Procedure 4 and Federal Rule of Bankruptcy Procedure 7004 by and through its registered agent Lloyd Douglas 1415 Ballinger Street, Fort Worth, Texas 76102.

10.    Defendant, Mt. Pleasant Operators, LLC ("Mt. Pleasant") is a Texas limited liability company and may be served with process pursuant to Federal Rule of Civil Procedure 4 and Federal Rule of Bankruptcy Procedure 7004 by and through its registered agent Lloyd Douglas 1415 Ballinger Street, Fort Worth, Texas 76102.

11.    Defendant, Specialty Select Care Center, LLC ("Specialty Select") is a Texas limited liability company and may be served with process pursuant to Federal Rule of Civil Procedure 4 and Federal Rule of Bankruptcy Procedure 7004 by and through registered agent Lloyd Douglas 1415 Ballinger Street, Fort Worth, Texas 76102.

12.    Defendant, Graham Investors Group, LLC ("Graham") is a Texas limited liability company and may be served with process pursuant to Federal Rule of Civil Procedure 4 and Federal Rule of Bankruptcy Procedure 7004 by and through registered agent Lloyd Douglas 1415 Ballinger Street, Fort Worth, Texas 76102.

13.    Defendant, Kemp Investor Holdings, LLC ("Kemp") is a Texas limited liability company and may be served with process pursuant to Federal Rule of Civil Procedure 4 and Federal Rule of Bankruptcy Procedure 7004 by and through its registered agent Lloyd Douglas 1415 Ballinger Street, Fort Worth, Texas 76102.

14.    Defendant, Kerens Care Center, Inc. ("Kerens") is a Texas corporation and may be served with process pursuant to Federal Rule of Civil Procedure 4 and Federal Rule of Bankruptcy Procedure 7004 by and through registered agent Lloyd Douglas 1415 Ballinger Street, Fort Worth, Texas 76102.

15.    Defendant, River City Life Care, Inc. ("River City") is a Texas corporation and may be served with process pursuant to Federal Rule of Civil Procedure 4 and Federal Rule of

Bankruptcy Procedure 7004 by and through its registered agent Lloyd Douglas 1415 Ballinger Street, Fort Worth, Texas 76102.

16.     Brownwood, D-5, Sunflower, Whispering Pines, Mt. Pleasant, Specialty Select, Graham, Kemp, Kerens and River City are collectively referred to herein as the "Fee Owners".

## IV.   **BACKGROUND**

17.     Debtor was the operator of a 124 bed skilled nursing home known as Casa Rio Healthcare and Rehabilitation located at 6211 S. New Braunfels Ave., San Antonio, Texas 78223 ("Casa Rio") and was part of a chain of ten (10) skilled nursing homes owned by Lloyd Douglas and managed by Lloyd Douglas Enterprises, L.C. At all relevant times, Douglas was the Manager of the Debtor and owned a ninety-nine percent (99%) interest while Michelle Douglas owned the other one percent (1%) interest in the Debtor.

18.     For each nursing home in the Douglas skilled nursing home chain, there was a fee owner, the property company, which was owned by Douglas which leased the location to an operator, the operating company, that was also owned by Douglas which in turn contracted the management services of Douglas Enterprises which was owned by Douglas as well. This so called OpCo/ProCo organizational structure was employed as a means of limiting liability, such as to potential personal injury and wrongful death claimants, while maximizing the income and overall profitability to the equity owner.

19.     At all relevant times, Douglas owned and controled Douglas Enterprises and the Fee Owners and served as manager of Douglas Enterprises and manager or president of the Fee Owners, as the case may be.

20.     Douglas, Douglas Enterprises and the Fee Owners are insiders of the Debtor.

**Income**

21.     As reflected on the Debtor's 2013 Form 1065 U.S. Return of Partnership Income, the Debtor reflected gross receipts of $6,317,563 and total deductions of $6,411,568, resulting in a stated loss of $94,005. The value of total assets was reported as $990,321.

22.     As reflected on the Debtor's 2014 Form 1065 U.S. Return of Partnership Income, the Debtor reflected gross receipts of $7,557,100 and total deductions of $6,912,244, resulting in ordinary business income of $644,856. The value of total assets was reported as $778,727.

23.     As reflected on the Debtor's 2015 Form 1065 U.S. Return of Partnership Income, the Debtor reflected gross receipts of $5,209,632 and total deductions of $4,755,494, resulting in ordinary business income of $469,142. The value of total assets was reported as $271,418.

**Douglas Enterprises Management Agreement**

24.     Upon information and belief, management of Casa Rio was performed by Douglas Enterprises pursuant to a Management Agreement dated effective September 1, 2011 for which Douglas Enterprises received compensation until the Management Agreement was terminated effective as of July 30, 2015.

**Sale of Douglas Skilled Nursing Home Chain**

25.     On or about May 1, 2015, Douglas Enterprises joined by the Fee Owners, Debtor and the other operators of the skilled nursing home chain entered into a Purchase and Sale Agreement with GruenePointe Acquisition I, LLC, a Texas limited liability company, or its permitted assignee ("GruenePointe"), pursuant to which GruenePointe agreed to purchase the assets of the skilled nursing home chain for the sum of $130 million.

26.     Closing of the sale of the assets of the skilled nursing home chain to GruenePointe

occurred on or about July 29, 2015. In conjunction with the sale of the assets, Debtor executed,

among others, the following documents:

a. <u>Operations Transfer Agreement</u> pursuant to which Debtor transferred to GruenePoint 1 Casa Rio, LLC ("GruenePointe 1 Casa Rio"), a subsidiary of GruenePointe the following described property:

1.      Transfer of Certain Assets and Operations.

1.1     Operator hereby agrees to sell, transfer and convey to Transferee, as of the Closing Date, all of its right, title and interest in and to all inventory and supplies at normal operating levels ("*Inventory*"), intangible personal property (as defined below) and tangible personal property owned by Operator which is related to or used in connection with the operation of the Facility ("*Personal Property*") including,

without limitation, all computers, software (to the extent permitted by applicable licensing agreements) and vehicles owned by Operator and used exclusively to transport residents (but excluding the personal property, which is not related or used in connection with the operation of the Facility, located in those certain offices at 1415 Ballinger Street, Fort Worth, Texas 76102 and 401 North Adams Street, Kemp, Texas 75143, and the time clocks currently used by the Operator and the associated computers and software). Such conveyance shall be accomplished by the execution and delivery to Transferee on the Closing Date of a Bill of Sale in the form attached hereto as Exhibit A. Operator shall not have any obligation to deliver the Personal Property to any location other than the Facility, it being understood and agreed that the presence of the Personal Property at the Facility on the Closing Date shall constitute delivery thereof. Notwithstanding anything in this Agreement, Transferee shall not acquire any rights in the Landlord Personal Property other than as expressly provided in the New Lease.

The conveyance by Operator to Transferee hereunder shall include:

(i)       Any service contract and equipment leases to which Operator is a party ("*Assumed Operating Contracts*") and have been expressly assumed by Transferee pursuant to Section 8 of this Agreement and further identified on Exhibit B attached hereto;

(ii)      Any provider agreements with Medicare and Medicaid and any other third party payor programs;

(iii)     Subject to the provisions of Section 7 hereof, all charts, personnel records, property manuals, resident/patient charts and records, lists, and similar documents maintained by Operator, except employee manuals, training materials, policies, procedures and materials related thereto which will be returned by Transferee within 120 days if requested by Operator in writing;

(iv)      All existing agreements with residents and any and all patient funds held in trust by Operator, which agreements and trust funds shall be deemed assumed by Transferee on the Closing Date;

(v)       All federal, state or municipal licenses, certifications, certificates, approvals, permits, variances, waivers, provider agreements and other authorizations certificates, to the extent assignable, which relate to the operation of the Facility;

(vi)      All assignable guarantees and warranties in favor of Operator with respect to any real property and equipment at the Facility;

(vii)     All other assignable intangible property not enumerated herein which is used by the Operator in connection with the operation of the Facility;

(viii)    All trade names associated with the Operator, including the name of the Facility as then known to the general public, and all goodwill associated therewith; and

(ix)      All telephone numbers used in connection with the operation of the Operator's business and all goodwill of Operator associated with Operator's business. The items described in clauses (vi) through (ix) above are collectively referred to as "*Intangible Personal Property*".

b. Bill of Sale pursuant to which Debtor transferred to GreunePointe Casa Rio (and on July 30, 2015 to GruenePointe1 Casa Rio) the following described property:

**Transferred Properties:**

The Inventory, the Personal Property, and the Intangible Personal Property, defined by that certain Operations Transfer Agreement between the parties, all of which is located on or near the skilled nursing facility known as Casa Rio Healthcare and Rehabilitation in Bexar County, Texas.

     c.  <u>Assignment and Assumption Agreement</u> pursuant to which Debtor transferred to GreunePoint 1 Casa Rio all right title and interest in and to certain assumed operating contracts as follows:

1.    <u>Assignment and Assumption</u>. Assignor hereby transfers and assigns all of its right, title and interest in and to the Assumed Operating Contracts and Assignee hereby accepts such transfer and assignment and assumes all obligations in connection with the Assumed Operating contracts, arising or first becoming due and payable after the date hereof.

     d.  <u>Termination of Management Agreement</u> pursuant to which Debtor terminated the Management Agreement.

27.    Debtor received no cash consideration whatsoever for the sale of the assets in conjunction with the sale of the skilled nursing home chain. Instead, the net purchase money from the sale was diverted to Douglas, Douglas Enterprises, Specialty Select or other of the Fee Owners.

28.    The 2015 Form 1065 U.S. Return for Partnership Income filed by the Debtor reflected proceeds of sale from the sale of business of $5,089,672 and a net gain of $4,975.393 on the sale. The subject return was prepared on or about September 20, 2016 and filed soon thereafter.

29.    After lengthy discussions with Douglas prior to commencement of this adversary proceeding, Douglas caused to be filed by the Debtor, on or about July 17, 2020, without the authorization of the Trustee and Plaintiff herein, an amended 2015 Form 1065 U.S. Return for Partnership Income removing all references to the asset sale.

**<u>Value of the Debtor's Assets Sold</u>**

30.     The Plaintiff has engaged the firm of Ankura Consulting Group, LLC to perform a fair market value analysis of the business enterprise of the Debtor as of the date of closing of the sale to GruenePointe 1 Casa Rio. Mr. Jerry M. Chang, CFA, has performed the analysis and formed a valuation opinion. Although other approaches to valuation were considered, Mr. Chang relied on the indicated value developed using the income approval to determine the concluded equity value. According to Mr. Chang, a hypothetical willing buyer would likely consider the cash flow generating ability of the Debtor as the primary criteria in the decision-making process. As a result, Mr. Change relied on the capitalization of cash flow method where an estimate of the stabilized debt-free cash flow is capitalized using an estimate of the weighted average cost of capital less the expected long-term growth rate. Mr. Chang utilized projections of revenues and expenses based on the Debtor's tax returns to develop a stabilized cash flow estimate.

31.     Based on his analysis, Mr. Chang has arrived at a fair market value of the Debtor's business enterprise of $2,788,251, with a (+/-5%) concluded range of value of $2,650,000 to $2,930,000. A true and accurate copy of the Mr. Chang's Independent Fair Market Valuation of the Business Enterprise ("BEV") of Specialty Select Care of San Antonio dba Casa Rio Healthcare Rehabilitation Center (the "Appraisal") is attached hereto and incorporated herein as **Exhibit 1.**

**Schedules and Statement of Financial Affairs**

32.     The Debtor commenced its chapter 7 bankruptcy case on October 20, 2017. The Schedules of assets and liabilities filed November 9, 2017 [Docket No. 8] reflected two secured creditors: LD Enterprises with a $200,000 claim secured by a "blanket filing UCC; all debtor assets" and Lloyd Douglas with a $362,725 claim secured by a "UCC filed; blanket lien on all assets". In both instances, the Debtor responded in the negative with respect to the question: "Is

the creditor an insider or related party?" There are no reported priority unsecured claims while non-priority unsecured claim of $67,701.50 were reported. The Statement of Financial Affairs filed November 9, 2017 [Docket No. 9] reflected four wrongful death suits with a total of ten claimants pending as of the Petition Date.

**Proofs of Claim**

33.    A total of fifteen proofs of claim have been filed in the Debtor's bankruptcy case, ten of which are personal injury/wrongful death cases. Ten personal injury/wrongful death cases were pending against the Debtor as of the Petition Date. Amended proofs of claim have been filed and the total of the amounts to $3,128,320.16. On March 22, 2018, LD Enterprises filed a Proof of Claim as a general unsecured claim in the amount of $200,000 (the "Douglas Enterprises Claim"). The Douglas Enterprises Claim was docketed as Claim No. 3-1 on the Claims Register maintained by the Clerk of the Bankruptcy Court. No documentation was attached in support of the Douglas Enterprises Claim. The remainder of the claims filed are general unsecured claims and total $10,236.29.

**Wrongful Death Cases**

34.    The ten personal injury/wrongful death cases were commenced against the Debtor pursuant to petitions filed March 26, 2014 or August 28, 2014 (the "Wrongful Death Cases"). Attached hereto and incorporated herein as **Exhibit 2** is a Summary of Wrongful Death Cases which provides the Claim Number assigned the proof of claim filed with the Bankruptcy Court, the name of the deceased, the estate representative, the amount of each claim and the date litigation against the Debtor was commenced. Each of the individual claimants in the Wrongful Death Cases serves as a triggering creditor.

35.    The firm of Marynell Maloney Law Firm, PLLC out of San Antonio, Texas represents the plaintiffs in the Wrongful Death Cases. Michelle M. Maloney the attorney with primary responsibility for the Wrongful Death Cases has provided a Timeline of Litigation which details milestone events in the representation of the Wrongful Death Cases which spans from March 26, 2014, the day the first of the Wrongful Death Cases were filed, through September 2018, nearly a year after the Debtor's bankruptcy case was initiated. The Timeline of Litigation is attached hereto and incorporated herein as **Exhibit 3**.

**Debtor's Assets**

36.    On the Petition Date, there was the sum of $28,727.05 in the Debtor's bank account available for satisfaction of allowed claims, including the personal injury/wrongful death claims, all other assets of the Debtor having been conveyed to GruenePointe 1 Casa Rio.

**Captive Insurance Companies**

37.    On or about December 21, 2010, two captive insurance companies were formed by Douglas pursuant to IRC section 831(B)(2)(A) to insure risks of the Douglas skilled nursing home chain. Douglas and Douglas Enterprises acting on behalf of the Debtor contracted with one of those captives, Brae Insurance Company Limited, to provide a Long Term Care Facility Liability insurance policy No. NBIC2010-10R15 with a limit of $250,000 per each medical incident and with a general aggregate limit of $750,000 (the "Brae Insurance Policy"). The Brae Insurance Policy was purchased in 2010 and was therefore in effect at the time of the incidents which gave rise to the Wrongful Death Cases; however, coverage for the medical incidents was denied in each instance.

38.    Douglas and Douglas Enterprises understood, at the time the captive insurance companies were formed and at the time the Brae Insurance Policy was secured, that the

contracted for insurance coverage was wholly inadequate thereby leaving the Debtor without insurance coverage for potential risks including wrongful death claims, such as aforementioned Wrongful Death Cases.

**Transfer(s) to Lloyd Douglas**

39.      Douglas was the recipient of one or more transfers within the four years immediately preceding the Petition Date. Following the closing of the sale of the Douglas skilled nursing home chain on July 29, 2015, Douglas was the recipient of transfers totaling no less than $301,643.75 (the "Douglas Transfers") as follows:

| Date of Check | Date Honored | Check No. Or Electronic Transfer | Amount of Transfer |
|---|---|---|---|
| 09/23/15 | 09/30/15 | 5239 | $    5,158.25 |
| 10/09/15 | 10/20/15 | 5250 | 24,846.90 |
| 01/26/16 | 02/22/16 | 5271 | 19,433.70 |
| 02/08/16 | 02/08/16 | Electronic Transfer | 160,000.00 |
| 04/08/16 | 05/02/16 | 5279 | 19,978.19 |
| 05/26/16 | 07/05/16 | 5280 | 17,366.32 |
| 08/25/16 | 09/16/16 | 5284 | 35,000.00 |
| 01/04/17 | 01/24/17 | 5286 | 19,860.39 |
| **Total** | | | **$301,643.75** |

**Lloyd Douglas Proof of Claim**

40.      On March 22, 2018 Douglas filed Proof of Claim No. 4-1 reflecting an unsecured claim in the amount of $362,725.00 for money loaned (the "Douglas Claim"). Douglas failed to provide documentation in support of the Douglas Claim.

41.      During the course of operations of the Debtor, Douglas made cash advances to the Debtor and maintained a running ledger balance of sums alleged to be due from the Debtor. The Debtor maintained a ledger of transactions between the Debtor and Douglas titled "Due to Owners/Officers" which reflects advances from Douglas to the Debtor and distributions back to

Douglas from the Debtor. The ledger covers the period of September 7, 2011 through January 24, 2017.

**Transfer(s) to Douglas Enterprises**

42.     Douglas Enterprises was the recipient of one or more transfers within the four years immediately preceding the Petition Date. Following the closing of the sale of the Douglas skilled nursing home chain on July 29, 2015, Debtor transferred, on December 23, 2015, via electronic transfer to Douglas Enterprises the sum of $225,000 (the "Douglas Enterprises Transfer"). The Debtor maintained a ledger of transactions between the Debtor and Douglas titled "Due to LD Enterprises" which reflects advances from Douglas Enterprises to the Debtor and distributions back to Douglas Enterprises from the Debtor. The ledger covers the period of October 5, 2011 through February 22, 2016.

43.     All conditions precedent to Plaintiff's recovery on the claims asserted herein have occurred.

**COUNT 1**

**(AVOIDANCE OF ACTUAL FRAUDULENT TRANSFERS
PURSUANT TO 11 U.S.C. §§ 548(a)(1)(A) and 550**

44.     Plaintiff incorporates the facts stated above as if fully set forth herein.

45.     Section 548(a)(1)(A) of the Bankruptcy Code allows the trustee to avoid a transfer of the debtor's interest in property made within two years of the petition date if the transfer was made with the actual intent to hinder, delay, or defraud creditors. Section 550 allows the trustee to recover the asset transferred in violation of section 548. Avoidable transfers may be recovered from the initial transferees pursuant to section 550(a)(1) of the Bankruptcy Code. Avoidable transfers may be recovered from subsequent transferees pursuant to section 550(a)(2) of the Bankruptcy Code.

46.     The Debtor made and transferred assets to the respective Defendants (at the direction of Douglas) with the actual intent to hinder, delay, or defraud Debtor's creditors pursuant to 11 U.S.C. § 548(a)(1)(A).

47.     Within the two year period prior to the Petition Date, the Debtor made or transferred to (a) Douglas Enterprises, the sum of $225,000; and (b) Douglas, the sum of $301,653.75.

48.     The Debtor made the Douglas Transfers and the Douglas Enterprises Transfer with actual intent to hinder, delay, or defraud creditors. By transferring these assets to or for the benefit of the Defendants under the guise of loan repayments without disclosing the transfers, the Debtor concealed the fact that money was being transferred to the Defendants. The transfers hindered, delayed, and defrauded creditors because they placed funds out of their reach and out of their discovery.

49.     Several "badges of fraud" demonstrating Debtor's actual intent to hinder, delay, or defraud are present. *See, e.g.*, *Chastant v. Chastant* (*In re Chastant*), 873 F.2d 89, 91 (5th Cir. 1989)), including the following.

50.     <u>The Transfer Was to an Insider</u>: Douglas owned and controlled the Debtor, Douglas Enterprises and the Fee Owners. Defendants are insiders of the Debtor as that term is defined pursuant to section 101(31)(A) of the Bankruptcy Code.

51.     <u>The Transfer Was Concealed</u>: The diversion of the Douglas Transfers and the Douglas Enterprises Transfer were made in either in whole or in part under the guise of business-related payments.

52.    <u>Existence of Litigation</u>: The Wrongful Death cases were filed in the period between March 26, 2014 and August 28, 2014, well in advance of the Douglas Transfers and the Douglas Enterprises Transfer.

53.    <u>The Transfer Was of Substantially all of the Debtor's Assets</u>: At the time the Douglas Transfer and the Douglas Enterprises Transfers were made, they resulted in the transfer of substantially all of the Debtor's assets. After the Douglas Transfer was made, the Debtor's bank account was reduced to $149,320.19 in December of 2015. Then in February of 2016 when $160,000 of the Douglas Enterprises Transfer was made, the balance in the Debtor's bank account was reduced to $9,982.58.

54.    <u>Debtor Was Insolvent or Became Insolvent</u>: The Debtor was insolvent or became insolvent as a direct result of the Douglas Transfers and the Douglas Enterprises Transfer.

55.    <u>Existence or Cumulative Effect of the Pattern of Series of Transactions</u>: The Debtor preferred Douglas and Douglas Enterprises over the claims of other unsecured creditors in making the Douglas Transfers and the Douglas Enterprises Transfer and had the effect of eliminating the Debtor's ability to satisfy the claims of unsecured creditors. Moreover, using a captive insurance company to satisfy regulator insurance requirements was designed to provide the appearance of liability insurance coverage when, in fact, there was not.

56.    <u>The General Chronology of Events and Transactions</u>: The transactions, the subject of inquiry, were made over a period of time under a scheme to siphon money away from the Debtor and its creditors. The idea was to delay litigation as long as possible with available funds and when the funds were finally exhausted, file a chapter 7 bankruptcy case. For example, in correspondence dated March 15, 2017, Adam Barela of the Sullivan & Cook, LLC firm (counsel for the Debtor in the Orlando Cisneros litigation) advised counsel for the Wrongful

Death Claimants that while Debtor was agreeable to mediation the Debtor would be unable to pay the American Health Lawyers Association's fee to arbitrate. This, after hundreds of thousands of dollars had been distributed to Douglas and Douglas Enterprises. The Litigation Timeline attached hereto as **Exhibit 3** demonstrates the contempt shown Plaintiffs in the Wrongful Death Cases and lends perspective with respect to the Debtor's intent to hinder, delay and defraud its creditors at every opportunity.

57.    All factors considered, the badges of fraud indicate the Debtor intended to hinder, delay and defraud its creditors. Personal injury/wrongful death claims are to be anticipated in a skilled nursing home; however, the Debtor and Defendants worked in concert to frustrate the ability of such claimants to be compensated for their damages. The Brae Insurance Policy secured from the captive insurance company provided the appearance of coverage, but failed to tender coverage for in the Wrongful Death Claims. Further, the Debtor engaged counsel to defend the pending Wrongful Death Claims litigation; however, because the Debtor was without sufficient resources to defend the litigation to conclusion, the defense continued until available Debtor resources were virtually exhausted. It was only then that Debtor took the final action of commencing the underlying bankruptcy case.

58.    The Debtor employed a scheme of transferring cash resources, which would otherwise have been available to respond to a judgment, to insiders. Douglas received the Douglas Transfers while Douglas Enterprises received the Douglas Enterprises Transfer in preference to other creditors. All with the effect of hindering, delaying and defrauding creditors of the Debtor.

59.    Certain of the Defendants were initial transferees of avoidable transfers within the meaning of the Bankruptcy Code.

60.     Certain of the Defendants were subsequent transferees of avoidable transfers within the meaning of the Bankruptcy Code and were not transferees in good faith and had or should have had ample knowledge and awareness of the avoidability of the initial transfers at the time they were received.

61.     Accordingly, Plaintiff respectfully requests that the Court avoid the transfers of Debtor's cash and other assets as fraudulent transfers under section 548(a)(1)(A) and return the transferred property and/or its value to the bankruptcy estate pursuant to section 550.

## COUNT II

### (AVOIDANCE OF CONSTRUCTIVE FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 548(a)(1)(B) and 550)

62.     Plaintiff incorporates the facts stated above as if fully set forth herein.

63.     Section 548(a)(1)(B) allows the trustee to avoid a transfer of the debtor's interest in property made within two years of the petition date if the debtor received less than reasonably equivalent value for the transfer and the debtor: (i) was insolvent at the time of the transfer or was rendered insolvent by the transfer; or (ii) was engaged in a business for which the debtor's remaining property was un unreasonably small capital. Section 550 allows the trustee to recover the value of the property transferred in violation of section 548. Avoidable transfers may be recovered from initial transferees pursuant to 550(a)(1) of the Bankruptcy Code. Avoidable transfer may be recovered from subsequent transferees pursuant to section 550(a)(2) of the Bankruptcy Code.

64.     The Debtor received less than equivalent value for the Douglas Transfers. In the two years immediately preceding the Petition Date, a total of $195,000 ($160,000 on February 8, 2016 and $35,000 on July 1, 2016) was transferred to Douglas in return of capital Douglas had infused into the Debtor. Douglas had injected capital into the Debtor with no guarantee of

recouping that investment and with the full knowledge of the risks involved.On the date of the Douglas Transfer, the Debtor was insolvent or became insolvent as a result of the transfer. The sale of substantially all of the Debtor's assets to GruenePoint 1 Case Rio had left the Debtor with limited assets and ability to satisfy any claims including the attorneys for defense of the personal injury claims.

65.     The Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital.

66.     The Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured. With the pending Wrongful Death Claims, the Debtor employed a strategy of defending the litigation until virtually all Debtor resources were exhausted. As of the Petition Date, there was a balance on hand in the Debtor's bank account of $28,727.05.

67.     Douglas was an initial transferee of the avoidable transfer within the meaning of the Bankruptcy Code.

68.     Certain of the Defendants were subsequent transferees of the avoidable transfer within the meaning of the Bankruptcy Code and were not transferees in good faith and had or should have had ample knowledge and awareness of the avoidability of the initial transfers at the time they were received.

69.     Accordingly, Plaintiff respectfully requests that the Court avoid the transfer of Debtor's cash as a constructive fraudulent transfer under section 548(a)(1)(B), and recover the value of the transferred property and/or its value to the bankruptcy estate pursuant to section 550.

<u>**COUNT III**</u>

**(AVOIDANCE OF ACTUAL AND CONSTRUCTIVE FRAUDULENT TRANSFERS
PURSUANT TO TEXAS UNIFORM FRAUDULENT TRANSFER ACT AND
11 U.S.C. §§ 544(b) AND 550)**

70.     Plaintiff incorporates the facts stated above as if fully set forth herein.

71.     The Texas Uniform Fraudulent Transfer Act ("<u>TUFTA</u>"), codified as Chapter 24 of the Texas Business and Commerce Code, permits the recovery of the value of any transfers made "with actual intent to hinder, delay, or defraud any creditor of the debtor" as well as those made "without receiving a reasonably equivalent value in exchange for the transfer or obligation. TUFTA §24.005. Transfer made within four years of the Petition Date may be avoided. TUFTA §24.010.

72.     Section 544(b) of the Bankruptcy Code allows the trustee to avoid a transfer of the debtor's interest in property that is voidable under applicable law – in this case, TUFTA. Section 550 of the Bankruptcy Code allows the trustee to recover the value of the property transferred in violation of section 548. Avoidable transfers may be recovered from the initial transferees pursuant to section 550(a)(1) of the Bankruptcy Code. Avoidable transfers may be recovered from subsequent transferees pursuant to section 550(a)(2) of the Bankruptcy Code.

73.     Plaintiff has indicated above that all ten claimants in the Wrongful Death Cases serves as a triggering creditor. As described on Exhibit 2 attached hereto, petitions for each of the claimants in the Wrongful Death Cases were filed either March 26, 2014 or August 28, 2014.

**Actual Fraud**

74.     As set forth herein, the Douglas Transfers to Douglas, the Douglas Enterprises Transfer to Douglas Enterprises and the diversion of the sale proceeds justly due the Debtor from

the sale of its assets to GruenePointe 1 Casa Rio were made with the actual intent to hinder, delay or defraud the legitimate credits of the estate.

75.    At closing of the GruenePointe 1 Casa Rio acquisition, which occurred within the four year period prior to the Petition Date, Debtor received no consideration whatsoever for the valuable assets transferred to GruenePointe 1 Casa Rio. Instead, Douglas, acting on his own behalf and on behalf of the entities he controls, namely the Debtor, Douglas Enterprises and the Fee Owners, caused the consideration justly due to the Debtor to be transferred to Douglas, Douglas Enterprises and/or the Fee Owners. The value transferred by the Debtor to the respective Defendants is in the range of $2,040,000 to $2,260,000.

76.    For the same reasons set forth under **COUNT ONE** above, several "badges of fraud" demonstrating the Debtor's actual intent to hinder, delay, or defraud are present. Additionally, since the transfer of the Debtor's assets to GruenePointe 1 Casa Rio occurred outside of the two-year period the subject of **COUNT ONE**, Plaintiff has identified the following additional "badges of fraud" demonstrating the Debtor's actual intent to hinder, delay, or defraud its creditors in connection with the asset sale.

77.    The Transfer Was to an Insider: Douglas owned and controlled the Debtor, Douglas Enterprises and the Fee Owners. Defendants are insiders of the Debtor as that term is defined pursuant to section 101(31)(A) of the Bankruptcy Code.

78.    The Transfer Was Concealed: The diversion of the sale proceeds from the Debtor to one or more of the Defendants in connection with the GruenePointe 1 Casa Rio acquisition was made in either in whole or in part under the guise of business-related payments. Moreover, the Debtor amended its 2015 Form 1065 U.S. Return of Partnership Income to conceal the sale and alter the information originally provided the Internal Revenue Service in the original return.

79.    <u>Existence of Litigation</u>: The Wrongful Death cases were filed in the period between March 26, 2014 and August 28, 2014, well in advance of the sale to GruenePointe 1 Casa Rio.

80.    <u>The Transfer Was of Substantially all of the Debtor's Assets</u>: The transfer of the Debtor's Assets to GruenePointe 1 Casa Rio was of substantially all of the Debtor's assets. All that remained was the Debtor's bank account and right to receipt of receivables from the final cost report.

81.    <u>Less Than Reasonably Equivalent Value Exchanged</u>: The Debtor received no consideration whatsoever for the transfer of assets to GruenePointe 1 Casa Rio. Instead, the Debtor transferred value in the range of $2,650,000 to $2,930,000 to one or more of the Defendants.

82.    <u>Debtor Was Insolvent or Became Insolvent</u>: The Debtor was insolvent or became insolvent as a direct result of the transfer to GruenePointe 1 Casa Rio and after closing of the transfer to GruenePointe 1 Casa Rio on July 29, 2015, each transfer was made at the time the Debtor was insolvent.

83.    <u>Existence or Cumulative Effect of the Pattern of Series of Transactions</u>: The diversion of the sale proceeds from the GruenePointe 1 Casa Rio assets sale was part of a series of transfers by the Debtor designed to reduce its cash reserves and had the effect of eliminating the Debtor's ability to satisfy the claim of unsecured creditors.

84.    <u>The General Chronology of Events and Transactions</u>: The transactions, the subject of inquiry, were made over a period of time under a scheme to siphon money away from the Debtor and its creditors.

85.     All factors considered, the badges of fraud indicate the Debtor intended to hinder, delay and defraud its creditors. Personal injury/wrongful death claims are to be anticipated in a skilled nursing home; however, the Debtor and Defendants worked in concert to frustrate the ability of such claimants to be compensated for their damages. The Brae Insurance Policy secured from the captive insurance company provided the appearance of coverage, but failed to tender coverage in all ten Wrongful Death Cases. Further, the Debtor engaged counsel to defend the pending personal injury/wrongful death claims; however, because the Debtor was without sufficient resources to defend the litigation to conclusion, the defense continued until available Debtor resources were virtually exhausted. It was only then that Debtor took the final action of commencing the underlying bankruptcy case.

86.     Further, the Debtor employed a scheme of transferring cash resources, which would otherwise have been available to respond to a judgment, to insiders. Douglas Enterprises received the Douglas Enterprise Transfer, Douglas received the Douglas Transfer in preference to other creditors and Douglas, Douglas Enterprises and/or the Fee Owners received the proceeds of sale of the Debtor's assets to GruenePointe 1 Casa Rio. All with the effect of hindering, delaying and defrauding creditors of the Debtor.

**Constructive Fraud**

87.     As stated above, all claims the subject of the Wrongful Death Cases serve as triggering creditors.

88.     Alternatively, the Debtor received less than equivalent value for the transfer of its assets to GruenePointe 1 Casa Rio on or about July 29, 2015. In fact, the Debtor received absolutely no monetary consideration for the assets transferred to GruenePointe1 Casa Rio.

89.     On the date of the transfer to GruenePoint 1 Casa Rio, the Debtor was insolvent or became insolvent as a result of the transfer. The sale of substantially all of the Debtor's assets to GruenePoint 1 Case Rio left the Debtor with limited assets and ability to satisfy any claims, including the attorney fees for defense of the personal injury claims.

90.     Certain of the Defendants were initial transferees of avoidable transfers within the meaning of the Bankruptcy Code.

91.     Certain of the Defendants were subsequent transferees of avoidable transfers within the meaning of the Bankruptcy Code and were not transferees in good faith and had or should have had ample knowledge and awareness of the avoidability of the initial transfers at the time they were received

92.     Accordingly, Plaintiff respectfully requests that the Court avoid the transfers of Debtor's cash and other assets as actual and/or constructive fraudulent transfers under section 544(b) and applicable Texas state law, and recover the value of the transferred property and/or value to the bankruptcy estate pursuant to section 550.

## COUNT IV

### (AVOIDANCE OF PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. 547 AND 550)

93.     Plaintiff incorporates the facts stated above as if fully set forth herein.

94.     Douglas is an insider of the Debtor and received check number 5286 drawn on Debtor's account no. xxxx0659 at Wells Fargo Bank dated January 4, 2017 in the amount of $19,860.39 (the "Check"). The Check was honored January 24, 2017.

95.     The Check was in reimbursement of expenses, primarily attorney fees incurred in defending the Wrongful Death Cases, which were satisfied by Douglas. These individual

invoices had been collected between May of 2016 and January 2017 and were actually reimbursed on January 4, 2017.

96.     The transfer the subject of the Check occurred within the year prior to the Petition Date, while the Debtor was insolvent.

97.     Such an amount is more than Douglas would receive were this case a chapter 7 liquidation.

98.     Accordingly, Plaintiff respectfully requests that the Court avoid such transfer(s) as avoidance preference payments under section 547(b) and return the preferential transfer(s) to the Plaintiff pursuant to section 550.

## <u>COUNT V</u>

### (BREACH OF FIDUCIARY DUTY)

99.     Plaintiff incorporates the facts stated above as if fully set forth herein.

100.    Although Debtor was organized as a limited liability company instead of a corporation, the same fiduciary duties of loyalty, due care, and obedience applicable to corporate officers and directors governed the conduct of Debtor's officers and managers[1].

101.    At all relevant times, Douglas was a ninety-nine percent (99%) of the Debtor as serves its manager.

102.    In connection with the sale of the skilled nursing home chain to GruenePointe, Douglas negotiated and executed the Purchase and Sale Agreement as well as amendments thereto for Douglas Enterprises, the Fee Owners, the Debtor as well as the other operating companies.

---

[1] *See, e.g., In re Hardee*, No. 11-6011, 2013 WL 1084494, at *9 & n.40 (Bankr. E.D. Tex. 2013) (noting that the fiduciary duties of due care, loyalty, and obedience "applies to managers and/or members governing the activities of a limited liability company" under Texas law) (citations omitted).

103.    At closing of the sale of the skilled nursing home chain to GruenePointe, Douglas negotiated and executed all closing documents including the Operations Transfer Agreements, Bills of Sale, Assignment and Assumption Agreements, Termination of Management Agreements, Sublease Agreements, Lease Termination Agreements and Closing Statements (the "Sale Documents").

104.    In executing the GruenePointe sale documents, Douglas negotiated, approved and closed on a $130 million transaction which transferred substantially all of Debtor's assets to the purchaser, GruenePointe 1 Casa Rio, without the Debtor receiving any monetary return in exchange. Instead, the net proceeds of sale were distributed to Douglas, Douglas Enterprises and the Fee Owners leaving the Debtor without sufficient cash reserves to satisfy claims of creditors. The entirety of the sale proceeds were diverted in whole.

105.    Moreover, after the Plaintiff discovered the gain on sale reported in the Debtor's Form 1065 U.S. Return of Partnership Income, Douglas attempted to cover up the diversion of funds from the Debtor by filing an amended 2015 Form 1065 U.S. Return of Partnership Income removing all references to the asset sale.

106.    Douglas put his own interests above the best interest of the Debtor by causing the Debtor to distribute to him $301,643.75 post-closing of the asset sale to GruenePointe 1 Casa Rio. The distribution of $301, 643.75 reduced Debtor's income as well as cash reserves available to respond to creditor claims.

107.    Douglas also put the interests of his wholly owned company, Douglas Enterprises above the best interest of the Debtor by causing the Debtor to distribute to Douglas Enterprises $225,000 post-closing of the asset sale to GruenePointe 1 Casa Rio.

108.    Douglas was well aware of the risk of personal injury and/or wrongful death at the Debtor-operated skilled nursing home.

109.    Douglas formed Brae Insurance Company Limited as a captive insurance company to provide liability insurance coverage the Debtor. Douglas understood, at the time the captive insurance companies were formed, and at the time the Brae Insurance Policy was secured, that the contracted for insurance coverage was wholly inadequate thereby leaving the Debtor without insurance coverage for potential risks including wrongful death claims, such as those the subject of the Wrongful Death Claims.

110.    The Brea Insurance Policy reflects limits of $250,000 per incident with a general aggregate limit of $750,000 (inclusive of defense expenses). The Brea Insurance Policy is a reimbursement policy.

111.    In contracting with his captive insurance company for the subject policy, Douglas essentially created a $250,000 fund to defend three covered incidents per year. The defense costs cannibalize the policy limits such that if defense costs run $100,000, there would only be $150,000 of remaining available coverage.

112.    Additionally, if there are four or more claims on the Brea Insurance Policy in a single year of coverage, the first three claims may be covered, but after that, claims made on the Brea Insurance Policy would automatically be denied as outside policy limits.

113.    In each instance, Douglas caused the injury to the Debtor by decisions he made in his fiduciary capacity as manager of the Debtor.

114.    Debtor has been injured by diversion of the proceeds of the GruenePointe 1 Casa Rio asset sale to Douglas, Douglas Enterprises and the Fee Owners. Debtor has been further injured the decision Douglas made to purchase the Brea Insurance Policy with the stated limits

which are unreasonably inadequate under the circumstances. Debtor now has liquidated unsecured claims asserted against the bankruptcy estate in $3.2 million, exclusive of administrative expenses, which it cannot pay.

115.    Accordingly, Plaintiff demands that Douglas pay damages to the Debtor in the amount it has been damaged by his wrongful acts and conduct.

## COUNT VI

## (OBJECTION TO DOUGLAS CLAIM)

116.    Plaintiff incorporates the facts stated above as if fully set forth herein.

117.    Rule 3001(c)(1) of the Federal Rules of Bankruptcy Procedure provides that "when a claim . . . is based on a writing, a copy of the writing shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim." Rule 3001(c)(1) Fed. R. Bankr. P.

118.    Under section 502(a) of the Bankruptcy Code, a claim or interest is deemed allowed unless a party-in-interest objects to the claim or interest.

119.    The Trustee objects to allowance of the Douglas Claim, which is not supported by any evidence whatsoever with respect to the existence or amount of the claim. Douglas' barebones proof of claim should not be entitled to the presumption of validity under section 502(a) and the Douglas Claim should be disallowed.

## COUNT VII

## (RECHARACTERIZATION OF DOUGLAS CLAIM AS EQUITY)

120.    Plaintiff incorporates the facts stated above as if fully set forth herein.

121.    In the event the Court determines that Douglas has some claim notwithstanding the above, the Court should properly construe that claim, together with any payments made by

the Debtor to Douglas on account of the claim, as a capital contribution – equity – rather than true indebtedness owed to Douglas.

122.    Once an objection to claim is made under section 502, the court determines the amount of such claim and shall allow such claim except to the extent that: (1) "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for the reason other than because such claim is contingent or unmatured." § 11 U.S.C. 502(a).The "applicable law" is state law. If a claim asserts a debt that is contrary to state law, the court may not allow the claim.

123.    Plaintiff asserts it is appropriate for the Douglas Claim to be properly characterized as contributions of equity rather than debt.

124.    This Court has weighed the following factors in determining whether an alleged loan should be re-characterized as a contribution:

> (a) The names given to the certificates evidencing the indebtedness; (b) the presence or absence of a fixed maturity date; (c) the source of the payments; (d) the right to enforce payment of principal and interest; (e) participation in management flowing as a result; (f) the status of the contribution in relation to regular corporate creditors; (g) the intent of the parties; (h) 'thin" or inadequate capitalization; (i) identity of interest between creditor and stockholder; (j) source of interest payments; (k) the ability of the corporation to obtain loans from outside lending institutions; (l) the extent to which the advance was used to acquire capital assets; and (m) the failure of the debtor to repay on the due date or seek postponement.[2]

125.    As described above and upon information and belief, Douglas maintained a running ledger balance of advances made to the Debtor. There was no fixed maturity date, no promissory note or other instrument reflecting the agreement of the Debtor to repay Douglas and no agreed upon interest rate.

---

[2] *In re Estill Med. Techs. Inc.*, 2003 WL 27356581, at *4 (Bankr. N.D. Tex. Sept. 12, 2003), aff'd 4:04-CV-400-A, 2004 WL 1773436 (N.D. Tex. Aug. 4, 2004)

126.    Capitalization was thin and available assets of the Debtor have proved insufficient to not only defend pending personal injury and wrongful death claims, but certainly to respond to a judgment.

127.    The Debtor's ability to obtain a loan of funds from an outside lending institution was virtually nonexistent and the Debtor has failed, over an extended period of time, to satisfy the Douglas Claim or make other payment arrangements.

128.    For these reasons and additional facts which may be developed in the course of this adversary proceeding, the Douglas Claim should be re-characterized as equity.

**WHEREFORE, PREMISES CONSIDERED**, Shawn K. Brown, Trustee and Plaintiff herein, respectfully prays that this Court enter a judgment against Defendants awarding Plaintiff (i) damages as set forth above; (ii) attorneys' fees and costs; (iii) pre and post-judgment interest on all of the foregoing amounts at the applicable rate; and (iv) such additional and further relief as this Court deems just and proper.

Dated this the 31ˢᵗ day of January, 2022.

                      Respectfully submitted,

                      LAW OFFICES OF JOSEPH F. POSTNIKOFF, PLLC
                      777 Main Street
                      Fort Worth, Texas 76102
                      Telephone: 817.335.9400
                      Email: jpostnikoff@postnikofflaw.com
                      Email: kherd@postnikofflaw.com

                      By: /s/ Joseph F. Postnikoff
                            Joseph F. Postnikoff
                            State Bar No. 16168320
                            Kevin G. Herd
                            State Bar No. 24027017

                      COUNSEL FOR SHAWN K. BROWN, CHAPTER
                      7 TRUSTEE AND PLAINTIFF HEREIN

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that on the 31ˢᵗ day of January, 2022, a copy of the foregoing Complaint was served via ECF on all parties registered with the Court to received ECF service and via email to the following:

Susan B. Hersh
Susan B. Hersh, P.C.
12770 Coit Road, Suite 850
Dallas, Texas 75251
Email susan@susanbhershpc.com

                            /s/  Joseph F. Postnikoff
                              Joseph F. Postnikoff