IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SPECIALTY SELECT CARE CENTER | § | Case No. 17-44248-elm-7 |
| OF SAN ANTONIO, LLC, | § | |
| | § | |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| SHAWN K. BROWN, Chapter 7 | § | |
| Trustee, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO.  20-04060-elm |
| | § | |
| LLOYD DOUGLAS, Individually, *et al*., | § | |
| | § | |
| Defendants. | § | |

## <u>JOINT PRETRIAL ORDER</u>

Pursuant to Local Bankruptcy Rule 7016(a) and the Court's Scheduling Order, Shawn K. Brown (the "<u>Trustee</u>"), the Chapter 7 trustee of Specialty Select Care Center of San Antonio, LLC. (the "<u>Debtor</u>"), and Lloyd Douglas, Lloyd Douglas Enterprises, L.C., Brownwood Care Center I, Ltd., D-5 Development, LLC, Sunflower Park Holdings, LP, Whispering Pines Healthcare, L.C., Mt. Pleasant Operators, LLC, Specialty Select Care Center, LLC, Graham Investors Group, LLC, Kemp Investor Holdings, LLC, Kerens Care Center, Inc., and River City Life Care, Inc. (collectively, the "<u>Defendants</u>," with the Trustee, each a "<u>Party</u>" and collectively the "<u>Parties</u>") submit this Joint Pretrial Order.

# I.

## SUMMARY OF CLAIMS AND DEFENSES

**A.**   **Plaintiff's Claims.**

There is no doubt Lloyd Douglas is a shrewd businessman. Douglas assembled a chain of ten (10) skilled nursing homes for which he owned and controlled the fee owners, the operating companies, master tenant, management company, and even a "captive" insurance company (Brae Insurance Company, Ltd.) that supposedly insured the Debtor against liability claims.

On May 1, 2015, Lloyd Douglas Enterprises, L.C. ("Douglas Enterprises"), joined by the Defendants and others, entered into a Purchase and Sale Agreement with GruenePointe Acquisition I, LLC, a Texas limited liability company, or its permitted assignee ("GruenePointe"), pursuant to which GruenePointe agreed to purchase the assets of the skilled nursing home chain for the sum of $130 million.

Closing of the sale of assets of nine (9) of the skilled nursing homes occurred on or about July 29, 2015, and in that sale the Debtor transferred substantially all of its assets to GruenePointe's assignee, GruenePointe 1 Kemp. Debtor retained only its cash on hand and accounts receivable.

The net distributed to Douglas Enterprises on account of the sale, after satisfaction of closing costs, professional fees, and claim of secured creditors, totaled $66,838,802.02.

Despite the fact the Debtor's original 2015 Form 1065 U.S. Return for Partnership Income filed by the Debtor reflected proceeds of sale from the sale of business of $5,089,672 and a net gain of $4,975.393 on the sale, the Debtor received no cash or other consideration from the sale[1].

The Trustee does not now, nor has he ever challenged the adequacy of the consideration paid by GruenePointe for the nursing home chain, which included Debtor's assets. Instead, the

---

[1] After lengthy discussions by the Trustee with Douglas prior to commencement of this adversary proceeding,

Trustee's complaint is lodged in the transfer of proceeds from the sale which were properly payable to the Debtor by the Buyer but were diverted by Debtor to Douglas or one or more of the other Defendants (the "Specialty Select Transfer").

The Trustee's valuation and insolvency expert, Jerry Chang, has placed a business enterprise and equity value of the assets of the Debtor, at the time of the sale to GruenePointe, at $2,100,000 with a range of value of between $2,000,000 and $2,200,000. Douglas's own accountant, David Liptz, testified he allocated $5,089,672.00 to Debtor's assets on its 2015 tax return using generally accepted accounting principles (GAP).

Insofar as Douglas owned and controlled all the seller entities, diversion of the sale proceeds properly payable to the Debtor to Douglas or one or more of the other Defendants would not have been problematic. However, there were a total of ten (10) personal injury wrongful death cases (the "Wrongful Death Claims") pending against the Debtor on the date of closing which Debtor had no plans to satisfy.

Until commencement of the Debtor's chapter 7 bankruptcy case, Debtor defended the Wrongful Death Claims and, following the commencement of the bankruptcy case, estate representatives of the decedent plaintiffs filed proofs of claims in the bankruptcy case which aggregate no less than $3,128,320.16.

In addition to diverting to Douglas, or one or more of the other Defendants, $2,100,000 of sale proceeds justly due to the Debtor, Debtor engaged in other practices which guaranteed there would be insufficient funds available to the Debtor to satisfy the Wrongful Death Claims.

In the two years immediately preceding the commencement of this bankruptcy case, the

---

Douglas caused to be filed by the Debtor, on or about July 17, 2020, without the knowledge, much less authorization, of the Trustee and Plaintiff herein, an amended 2015 Form 1065 U.S. Return for Partnership Income removing all references to the asset sale.

Debtor paid to Douglas Enterprises no less than $225,000 on account of an intercompany payable owed allegedly owed Douglas Enterprises (the "Douglas Enterprises Transfer") and the Debtor paid no less than $195,000 to Douglas on account of shareholder loans advanced by Douglas to the Debtor (the "Douglas $195,000 Transfers").

Additionally, Douglas owned and maintained a captive insurance company, Brae Insurance Company Limited, which was contracted by Debtor to provide Long Term Care Facility Liability insurance policy No. NBIC2010-03R15 with a limit of $250,000 per each medical incident and with a general aggregate limit of $750,000 (the "Brae Insurance Policy"). The Brae Insurance Policy was purchased in 2010 and was therefore in effect at the time of the incidents which gave rise to the Wrongful Death Claims; however, coverage for the medical incidents was denied in each instance, after consultation with Brae's owner, Lloyd Douglas.

Next, immediately prior to commencement of the Debtor's chapter 7 bankruptcy case, the Debtor issued an expense reimbursement of $19,860.39 to Douglas for accumulated litigation defense costs satisfied by Douglas (the "Douglas Payment").

In these proceedings, the Trustee seeks to avoid the Douglas Enterprises Transfer and Douglas $195,000 Transfers as actual and constructive fraudulent convenances under Bankruptcy Code sections 548(a)(1)(A), 548(a)(1)(B) and pursuant to the Texas Uniform Fraudulent Transfer Act and Bankruptcy Code section 544(b). Further, the Trustee seeks to avoid the Specialty Select Transfer pursuant to the Texas Uniform Fraudulent Transfer Act and Bankruptcy Code section 544(b). Additionally, the Trustee seeks to avoid the Douglas Payment pursuant to Bankruptcy Code section 547. Finally, the Trustee asserts a claim for breach of fiduciary duty against Douglas,

for obviously taking the Debtor's consideration and favoring his own interests over those of the Debtor.

The Trustee's valuation and insolvency expert, Jerry Chang, found that although the Debtor was solvent up until the time of the GruenePointe asset sale, the sale of substantially all of the Debtor's assets rendered the Debtor insolvent. Jerry Chang has further articulated that, all other things being equal, the Debtor remained insolvent at all times thereafter and during which the Douglas Enterprises, Douglas $195,000 Transfers and the Douglas Payment occurred.

**B.**     **Defendants' Defenses.**

The Defendants deny all of the Trustee's claims and deny any liability.  They do not believe that the Trustee will have any evidence on at least one element of each of his claims, as the Trustee's whole theory of his case—that Douglas transferred the going concern value of the Debtor to a buyer and pocketed for himself what should have been return cash consideration—is belied by the clear facts and unambiguous contracts and documents.  That is the real problem with the Trustee's case for, as two ships passing in the night, he simply does not understand—or want to understand—what the real, underlying transaction was.

At the center of the Trustee's claims is his allegation that Douglas sold his nursing homes and pocketed the proceeds in order to keep those proceeds from the disputed, personal injury and wrongful death creditors of the Debtor.  This is not true and, even after the sale, Douglas insured that the Debtor had sufficient assets left, of more than $1 million, to pay all legitimate debt, which it in fact did.  That Douglas did not pay the tort claims was not because he wanted to hinder, delay, or defraud them or their recovery, but simply because they were unproven, baseless, and worthless litigation claims.  What in the world can be wrong with that?

By early 2015, Douglas had been in the nursing home business for decades, working tirelessly and sacrificing every day to build up a network of ten successful nursing homes. At that time, and upon the pressuring of a broker who had pressed him to sell for years and to retire and to enjoy life, he decided to sell his portfolio because it was a crazy, seller's market where publicly traded entities, flush wish cash, were on a spending spree for nursing homes. Thus, Douglas sold his nursing homes on July 30, 2015, paid all secured debt, and netted a fortune to compensate him for his hard work, risks, and investments; *i.e.* the American Dream. The Trustee simply seeks to force him to pay a portion of his reward to disputed, unliquidated, contingent and bogus tort creditors.

In reality, the Debtor owned very little by way of assets. It leased the real property and improvements from its landlord. Importantly, it also leased from the landlord all furniture, fixtures, and equipment. It did have its cash and its receivables, as well as a provided number, certain vendor contracts (of no value), certain supplies (of no value), and certain intangible assets, such as goodwill (also of no value). The sale of the nursing homes, however, was a *real estate* transaction. The buyer, a REIT, was buying the dirt, <u>not</u> the operations, because it would lease the dirt to new operators. As with any reasonably prudent buyer, the buyer wanted the land free of lease encumbrances in order to lease to its own operator. The operations, therefore, had to cease. Thus, at the requirement of the buyer—and having nothing to do with the tort claims—the landlord and Debtor terminated the lease. At that moment—for which the Trustee has not sued and cannot sue—the Debtor ceased all operations and lost all going concern or enterprise value, as it no longer had real property, facilities, or FF&E. That, and not any fraudulent transfer or diversion of assets, is what happened to the Debtor. But ceasing operations is not a fraudulent transfer, as there is no

"transfer," and it is not a breach of fiduciary duty, without imposing involuntary servitude, even aside from the fact that the Trustee has not and cannot sue over that decision.

Minimal assets were transferred to the buyer, of no value to the Debtor or its creditors. The vendor contracts (like with the cell phone provider) had no value; the supplies on-site had a negative value if they had to be removed (who wants to buy used nursing home bed sheets); the intangibles and goodwill had no value (especially in light of the tort claims); and permitting the buyer the use of the Debtor's provider number for a period of time was standard in the industry and of no value to the Debtor, even if of some value to the buyer. True, the Debtor did not receive any monetary consideration for these worthless assets—not because any consideration was diverted to Douglas, but because no consideration was paid or payable for the same by the buyer. As the buyer was the initial transferee, the Trustee could have sued it, instead of chasing phantom dollars that allegedly made it to Douglas' pockets.

Again, the Trustee's theory of the case is simply wrong. There was no going concern that was sold. There were minimal assets that were transferred, that the Trustee has not valued, as is his burden to do. Even if the Trustee's claims have any merit, it would be only the value of those worthless assets that would be at play, as opposed to the millions of dollars sought by the Trustee for the non-existing and non-transferred going concern. But again, the Trustee has not valued those assets and, seemingly, does not even know what they were.

None of this had anything to do with not paying the disputed tort creditors; indeed, the transaction was ordinary and customary in the industry and was structured the same with respect to all ten properties. Nothing was different about the Debtor to suggest any trick. And, critically, the Debtor did not transfer its true assets, consisting of more than $1 million of cash and receivables, which Douglas left with the Debtor precisely to enable it to pay its legitimate debt.

Had he wanted to avoid paying creditors, he could have taken those assets.  But he did not.  Instead, he paid his employees (losing money on it) to collect and recover the receivables for almost one year, which enabled the Debtor to pay all of its legitimate, undisputed debt and to wind down its affairs.  That the tort claimants were not paid was not because of some master scheme, but because they were disputed claims not reduced to judgment that the Debtor was contesting in court, exactly as it should have.  And, when the Debtor could no longer pay the costs to defend the tort claims, it sought bankruptcy *protection*, never believing that the Trustee would casually focus the microscope on Douglas without focusing any scrutiny on the disputed tort claims.

Therefore, there was no actual fraudulent transfer, because the Debtor did not intend to hinder, delay, or defraud any creditor: it *paid* its legitimate creditors even after the sale.  There was no constructive fraudulent transfer because the Debtor was solvent before and after the sale and because the reasonable equivalent of zero is . . . zero.  The Trustee's theory that one takes disputed tort claims at face value is simply wrong, and not supported by the law.  Nor was there any breach of fiduciary duty, even if the Trustee preserved that claim (which he did not), as Douglas always acted in the interests of the Debtor, enabling it to pay legitimate debts and acting prudently and appropriately to wind down its affairs.  That the Trustee thinks that the Debtor does not have sufficient assets to pay its debts (based on the worthless tort claims, that is) is not the result of any fraudulent transfer or breach of fiduciary, if for no other reason than that the assets that were transferred, which of course is what the law of fraudulent transfer looks at, had no value.  Nothing was taken from anyone; no *res* was depleted.

The Trustee's claims to avoid what he deems management fees, as excessive and as fraudulent transfers, also fail, to the extent even preserved.  These fees go way back and predate the tort creditors by years, and were simply business as usual as opposed to a secret device to suck

value out of a sinking debtor.  The Debtor received perfect value for them, and the Debtor was never insolvent, either before or after them.  Finally, with respect to the Trustee's lone preference claim, the Debtor was solvent when it made the payment to Douglas, and the payment cannot therefore be avoided.

In the end, Douglas operated this business exactly as he should have, consistent with business ethics, morality, and the law: he paid all creditors in full.  That the Trustee apparently thinks that the disputed and unliquidated tort claims have some value, which they do not, begs the question of what Douglas should have done.  Should he have paid creditors he believed were bogus?  Might that be a breach of fiduciary duty?  Should he have subjected himself to involuntary servitude by keeping the Debtor going in order to pay these worthless claims and subjecting other creditors to a risk of recovery?  Hindsight matters for certain things, but not for fraudulent transfer or breach of fiduciary duty, where one's present *mens rea* is considered.  The Trustee's hindsight is absurd unless the Court concludes that Texas law imposes upon a businessman a duty to pay a disputed and unliquidated tort claim, that he in good faith believes to be baseless.  That is not a proposition for which this case should be remembered.

## II.

## STATEMENT OF STIPULATED FACTS

The Parties hereby agree to the following facts.  For the avoidance of doubt, in agreeing to these facts, the Parties are not implicitly or otherwise agreeing that these facts are exhaustive with respect to any given issue, and they reserve any and all arguments and rights with respect to any fact not expressly agreed to below, meaning, in addition to all other things, that an expressly agreed fact shall not be construed as an implicit admission as to any fact, argument, or allegation not expressly agreed to.

## A.    THE DEBTOR

1.      At all times material hereto, the Debtor was a Texas entity.

2.      Prior to July 30, 2015, the Debtor operated a 124 bed skilled nursing home known as Casa Rio Healthcare and Rehabilitation, located at 6211 S. New Braunfels Avenue, San Antonio, Texas (the "Nursing Home").  The Debtor had its own provider number and generated, owned, and collected its own receivables, including from private insurance, private pay, Medicaid, and Medicare.

3.      At all times material hereto, the Debtor was directly owned and solely controlled by Lloyd Douglas ("Douglas").

4.      At all times material hereto, Douglas owed fiduciary duties to the Debtor, as and to the extent provided by Texas law.

5.      Douglas' intentions are imputed to the Debtor with respect to the subject matter of this Adversary Proceeding.

6.      At all times material hereto, Douglas was an insider of the Debtor.

7.      The Debtor occupied the Nursing Home with authorization from Specialty Select Care Center, LLC (the "Landlord").

8.      At all times material hereto, the Landlord was directly owned by Douglas and solely controlled by Douglas.

9.      At all times material hereto, the Debtor and the Landlord were insiders.

10.     The Debtor and its Nursing Home were managed by Lloyd Douglas Enterprises, L.C. ("Douglas Enterprises") in exchange for certain management fees and expense reimbursements.

11.     Douglas Enterprises provided, among other things, various services to the Debtor, including officers, upper management, accounting, regulatory, legal, and collection services.  The Parties disagree whether these services were compensated or not.

12.     At all times material hereto, Douglas Enterprises was directly owned by Douglas and solely controlled by Douglas.

13.     At all times material hereto, the Debtor and Douglas Enterprises were insiders.

14.     In 2015 and before, the Debtor held liability insurance from Brae Insurance Company Limited ("Brae"), with a per claim limit of $250,000.00 and an annual limit of $750,000.00.

15.     The Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on October 20, 2017 (the "Petition Date"), thereby initiating Bankruptcy Case No. 17-44248-elm-7 (the "Bankruptcy Case") and creating its bankruptcy estate (the "Estate").

16.     The Trustee is the duly appointed Chapter 7 trustee of the Estate.

17.     On the Petition Date, the Debtor had cash on hand of $28,727.05.

**B.     THE SALE AND THE TRANSFER**

18.     In addition to his ownership of the Debtor, Douglas directly owned and controlled various entities that owned real estate and improvements, and operated, nine (9) other nursing homes.

19.     On May 1, 2015, Douglas Enterprises and various affiliated entities, including the Defendants, entered into that certain *Purchase and Sale Agreement* (the "PSA"), as the sellers, with GruenePointe Acquisition I, LLC (the "Buyer"), as the buyer, pursuant to which the sellers were to sell and transfer various property to the Buyer, while retaining certain property.

20. After certain extensions, the PSA closed on July 30, 2015, and the Buyer paid total gross consideration of $130,000,000.00 (the "Sale").

21. On July 31, 2015, Texas American Title Company, the closing agent for the Sale, wired to Douglas Enterprises the net seller proceeds from the Sale in the amount of $66,838,802.02.

22. None of the proceeds of the Sale were paid to the Debtor.

23. The broker for the Sale was Michael Craig Kelly.

24. In conjunction with the Sale, the Landlord and the Debtor executed a document which purported to terminate a lease of the Nursing Home as required by the Buyer and the PSA.

25. As part of the Sale and the PSA, the Debtor transferred various of its assets to the Buyer and/or the Buyer's assignee (the "Transfer").

26. The Transfer included the execution by the Debtor of that certain *Operations Transfers Agreement* to GruenePoint I Casa Rio, LLC (OpCo).

27. The Transfer included bills of sale from the Debtor to the Buyer.

28. The Debtor was not paid any cash consideration for the Transfer.

29. At the time of the Transfer, the Debtor had various undisputed trade debt.

30. Between March 26, 2014 and August 28, 2014, ten lawsuits were filed against the Debtor in Texas state court, alleging personal injury and wrongful death claims (the "Tort Claims"). The same law firm filed each of the Tort Claims lawsuits.

31. The Debtor disputed the Tort Claims and defended against them up to the Petition Date.

32. Brae denied coverage of the Tort Claims after consultation with Lloyd Douglas.

33.     At no time prior to or after the Petition Date were the Tort Claims reduced to judgment.

34.     No portion of the Tort Claims has been paid.

35.     In addition to the Tort Claims, non-insider unsecured proofs of claim were timely filed by (i) Texas Health & Human Services Commission for $5,901.05; (ii) McKesson Medical-Surgical Minnesota Supply, Inc. for $520.97; and (iii) Mobilex USA for $3,814.27.

36.     Additional creditors were listed on the schedules filed by the Debtor in the Bankruptcy Case, however, none filed claims in the Bankruptcy Case.

**C.   TRANSFERS**

37.     The Debtor made the following transfers to Douglas (the "Douglas Transfers"):

| Date of Check | Date Honored | Check No. Or Electronic Transfer | Amount of Transfer |
|---|---|---|---|
| 09/23/15 | 09/30/15 | 5239 | $ 5,158.25 |
| 10/09/15 | 10/20/15 | 5250 | 24,846.90 |
| 01/26/16 | 02/22/16 | 5271 | 19,433.70 |
| 02/08/16 | 02/08/16 | Electronic Transfer | 160,000.00 |
| 04/08/16 | 05/02/16 | 5279 | 19,978.19 |
| 05/26/16 | 07/05/16 | 5280 | 17,366.32 |
| 08/25/16 | 09/16/16 | 5284 | 35,000.00 |
| 01/04/17 | 01/24/17 | 5286 | 19,860.39 |

38.     The last such transfer for $19,860.39 is referred to as the "Douglas Payment." The Debtor made the Douglas Payment to Douglas, a creditor, in payment of antecedent debt it owed to Douglas.

39.     The transfers to Douglas which occurred February 8, 2016 in the amount of $160,000 and August 25, 2016 in the amount of $35,000 are jointly referred to as the "Douglas $195,000 Transfers".

40.     On December 23, 2015, the Debtor transferred $225,000.00 to Douglas Enterprises (the "Douglas Enterprises Transfer").

41.     On March 22, 2018. Douglas filed proof of claim number 4 with the Bankruptcy Court, asserting a general unsecured claim in the amount of $362,725.00 (the "Douglas Claim").

## III.

## CONTESTED ISSUES OF FACT[2]

The Parties agree that the following facts are contested (which list may not be exhaustive and is not intended to limit the Parties' right to offer and argue such other facts as may be relevant):

1.     Whether the Debtor had a lease with the Landlord that they subsequently terminated by agreement.

2.     Whether, at all relevant times, Brae was owned and controlled by Douglas.

3.     What the nature of the Douglas Transfers was, meaning what were they for.

4.     Whether the Debtor made the Douglas Transfers with the intent to hinder, delay, or defraud a creditor.

5.     What the nature of the Douglas Enterprises Transfer was, meaning what was it for.

6.     Whether the Debtor made the Douglas Enterprises Transfer with the intent to hinder, delay, or defraud a creditor.

7.     Whether the Debtor was insolvent when it made the Douglas Transfers, or was rendered insolvent by making them.

8.     Whether the Debtor received reasonably equivalent value for the Douglas Transfers.

9.     What value, and to what extent, Douglas gave for the Douglas Transfers, such as to not be avoidable or to have a preferential lien against any avoidance.

---

[2] The Parties reserve all rights to object to the admissibility of any evidence.

10.    Whether the Debtor had any going concern value or enterprise value immediately prior to the Transfer.

11.    Whether the Debtor had any going concern value or enterprise value immediately prior to the to the Specialty Select Transfer.

12.    What assets of the Debtor were transferred in the Transfer.

13.    What assets of the Debtor were transferred in the Specialty Select Transfer.

14.    What the value of the assets of the Debtor transferred in the Transfer was.

15.    What the value of the assets of the Debtor transferred in the Specialty Select Transfer was.

16.    What portion of the Debtor's trade debt was paid following the Sale from cash on hand and the collection of its receivables.

17.    Whether the Debtor was insolvent prior to the Transfer or rendered insolvent as a result of the Transfer.

18.    Whether the Debtor was insolvent prior to the Specialty Select Transfer or rendered insolvent as a result of the Specialty Select Transfer

19.    Whether any proceeds for the Transfer were properly payable to the Debtor by the Buyer and were diverted by Douglas to himself or one or more of the other Defendants.

20.    Whether the Debtor, through Douglas, intended to hinder, delay, or defraud a creditor by the Transfer.

21.    Whether the Debtor, through Douglas, intended to hinder, delay, or defraud a creditor by the Specialty Select Transfer.

22.    Whether the Debtor received reasonably equivalent value for the Transfer.

23.     Whether the Debtor received reasonably equivalent value for the Specialty Select Transfer.

24.     Whether, under TUFTA, there was a "golden creditor" of the Debtor at the time of the Transfer or within a reasonable period of time after the Transfer.

25.     Whether, under TUFTA, there was a "golden creditor" of the Debtor at the time of the Specialty Select Transfer or within a reasonable period of time after the Specialty Select Transfer.

26.     Whether the assets left with the Debtor after the Transfer were sufficient to enable the Debtor to wind down its operations and pay all undisputed debt in full.

27.     Whether the assets left with the Debtor after the Specialty Select Transfer were sufficient to enable the Debtor to wind down its operations and pay all undisputed debt in full.

28.     Whether the Debtor had any undisputed creditor at the time of the Transfer that was not paid prior to the Petition Date.

29.     Whether the Debtor had any undisputed creditor at the time of the Specialty Select Transfer that was not paid prior to the Petition Date.

30.     Whether the Debtor was insolvent at the time it made the Douglas Payment.

31.     Whether the Douglas Payment enabled Douglas to receive more on account of his debt than he would have had the Douglas Payment not been made and had the Debtor then filed Chapter 7 and Douglas have been repaid in such Chapter 7 case.

32.     Whether Douglas breached his fiduciary duties to the Debtor with respect to the Sale and Transfer, Specialty Select Transfer, Douglas Enterprises Transfer Douglas Payment, Douglas $195,000 Transfers, and with respect to the Brea insurance policy.

## IV.

## CONTESTED ISSUES OF LAW

The Parties agree that the following issues of law are contested (which list may not be exhaustive and is not intended to limit the Parties' right to offer and argue such other issues of law as may be relevant):

1.     How unliquidated and disputed personal injury and wrongful death claims are valued for insolvency purposes with respect to a fraudulent transfer or preference.

2.     Whether the Transfer or any transfer of property of the Debtor in the Sale or Transfer can be avoided and recovered as an actual fraudulent transfer under the Texas Uniform Fraudulent Transfer Act ("TUFTA").

3.     Whether the Specialty Select Transfer or any transfer of property of the Debtor in the Specialty Select Transfer can be avoided and recovered as an actual fraudulent transfer under the Bankruptcy Code or under the Texas Uniform Fraudulent Transfer Act ("TUFTA").

4.     Whether the Transfer or any transfer of property of the Debtor in the sale or Transfer can be avoided and recovered as a constructive fraudulent transfer under TUFTA.

5.     Whether the Specialty Select Transfer or any transfer of property of the Debtor can be avoided and recovered as a constructive fraudulent transfer under the Bankruptcy Code or under TUFTA.

6.     Whether the Trustee has standing under TUFTA and section 544 of the Bankruptcy Code with respect to there being a "golden creditor" with respect to the Sale or Transfer.

7.     Whether the Trustee has standing under TUFTA and section 544 of the Bankruptcy Code with respect to there being a "golden creditor" with respect to the Specialty Select Transfer.

8.     Whether the Trustee is prevented from presenting any evidence of the insolvency of the Debtor prior to or as a result of the Sale and Transfer because he failed to properly answer or supplement the Defendants' interrogatories on that point.

9.      Whether the Trustee may avoid and recover any of the Douglas Transfers as an actual fraudulent transfer under the Bankruptcy Code.

10.     Whether the Trustee may avoid and recover the Douglas Enterprises Transfer as an actual fraudulent transfer under the Bankruptcy Code.

11.     Whether the Trustee may avoid and recover any of the Douglas Transfers as a constructively fraudulent transfer under the Bankruptcy Code.

12.     Whether the Trustee may avoid the Douglas Enterprises Transfer without first avoiding the underlying agreement.

13.     Who Douglas owed fiduciary duties at the time of the Sale and Transfer, the Specialty Select Transfer, Douglas $195,000 Transfers and at the time of the Douglas Enterprises Transfers, or who would have had standing to assert claims for breaches of the same.

14.     Whether Douglas breached his fiduciary duties to the Debtor with respect to the Sale or Transfer or the Brae insurance.

15.     Whether Douglas breached his fiduciary duties to the Debtor with respect to the Specialty Select Transfer.

16.     Whether limitations applies to the Trustee's claims against Douglas for breach of fiduciary duty with respect to Brae insurance.

17.     Whether the Trustee is prevented from presenting any evidence as to the alleged damages for Douglas' alleged breach of fiduciary duty arising from the Trustee's responses to the Defendants' interrogatories.

18.     Whether the Trustee may avoid and recover the Douglas Payment as an insider preference under the Bankruptcy Code.

19.     Whether any of the Defendants would have had standing to object to the Tort Claims in the Bankruptcy Case.

20.     Whether the proof of claim of Texas Health & Human Services Commission is properly filed in that it provides no supporting documentation or explanation.

21.     Whether the proof of claim of McKesson Medical-Surgical Minnesota Supply, Inc. is properly asserted against the Debtor or is a claim against the buyer.

22.     Whether the proof of claim of Mobilex USA is property asserted against the Debtor or is a claim against the buyer, given that the invoice is addressed to the buyer for services provided well after the closing of the Sale.

23.     Whether the Trustee asserted and/or preserved a cause of action to avoid the Douglas Enterprises Transfer and the Douglas $195,000 Transfers under TUFTA and section 544 of the Bankruptcy Code as constructively fraudulent transfers.

24.     Defendants Lloyd Douglas and Lloyd Douglas Enterprises, L.C. filed proofs of claim in the Specialty Select bankruptcy and are parties in interest in that bankruptcy proceeding. As parties to the proceeding, they are not "third parties" and the ten wrongful-death claims are binding as to the claim and the amount on the Debtor. 11 U.S.C. 502(a).

25.     The law with regard to proofs of claim in bankruptcy is controlled by, and as stated above in the statutory recitations from the Code, e.g., §§ 562 and 3001. The correct statement of the law regarding unobjected-to claims was made by *Trustees of Operating Engineers Local 324 Pension Fund vs. Bourdow Contracting, Inc*., 919 F.3d 368 (Sixth Circuit 2019) (The validity and amount of a "deemed allowed" claim under Section 502(a) can even be binding in subsequent litigation between the same parties or their privies.)  "For the reasons articulated in EDP *Medical*[1] and *Siegel*,[2] we hold that an uncontested proof of claim that is allowed pursuant to

11 U.S.C. § 502(a) is a final judgment on the merits for the purposes of *res judicata*, with or without a separate court order specifically allowing the claim."

26.     The law of *res judicata* in the Fifth Circuit has been well litigated and stems from the seminal case of *Pollard vs. Cockrell*, 578 F.2d 1002 (5th Cir. 1978) insofar as the meaning of "privies" when the legal standard binding upon the parties and their "privies." The Fifth Circuit held: "In reviewing cases decided under the doctrine, we have described the types of relationships contemplated: "estate beneficiaries bound by administrators, presidents and sole stockholders by their companies, parent corporations by their subsidiaries, and a trust beneficiary by the trustee." *Pollard* at 1008-09.

27.     At a minimum, Lloyd Douglas and Lloyd Douglas Enterprises, L.C. are privies of the Debtor since Mr. Douglas is the equivalent of the president and sole stockholder of the Debtor, and Douglas Enterprises is the equivalent of a parent corporation, the Debtor being its subsidiary. Consequently, not only is a *prima facie* case established against the Defendants, but with respect to Lloyd Douglas and Lloyd Douglas Enterprises, L.C., they are bound by not only the validity of the uncontested claims, but also their amounts.

## V.

## ESTIMATED LENGTH OF TRIAL

The Parties estimate two days for the trial.

## VI.

## ADDITIONAL MATTERS THAT MIGHT AID IN DISPOSITION

The Parties have agreed to this Court's entry of final judgment on all claims in this Adversary Proceeding, even if any such claim is not a core claim under 28 U.S.C. § 157(b)(2).

The Parties agree that Texas law governs this Adversary Proceeding, except where the Bankruptcy Code governs.

The Parties have agreed that the quantification of any attorney's fees and costs award that

the Court may issue will be determined through post-trial procedures under Rule 54(d).

### # # #  END OF ORDER # # #

**AGREED:**

**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard Street, Suite 4000
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

By: ___/s/ Davor Rukavina_____
Davor Rukavina, Esq.
Texas Bar No. 24030781
Email: drukavina@munsch.com

**COUNSEL FOR LLOYD DOUGLAS,** *ET AL*
**DEFENDANTS**

**ROCHELLE MCCULLOUGH, LLP**
300 Throckmorton Street, Suite 520
Fort Worth, Texas 76102
Telephone: 817.347.5261
Facsimile: 817.347.5269
http://www.romclaw.com

By: ___/s/ Joseph F. Postnikoff (*w/ permission*)
        Joseph F. Postnikoff
        State Bar No. 16168320
Email: jpostnikoff@romclaw.com

**COUNSEL FOR SHAWN K. BROWN, PLAINTIFF**

**and**

**PASSMAN & JONES**
1201 Elm Street, Suite 2500
Dallas, Texas 75270-2599
Telephone: 214.742.2121

Facsimile: 214.748.7949

**SPECIAL COUNSEL FOR SHAWN K. BROWN,
CHAPTER 7 TRUSTEE AND PLANITIFF**